**In re Dale E. & Colleen M. VOLPE, Debtors.**

**W.C.T.A. FEDERAL CREDIT UNION, Plaintiff,**

**v.**

**Dale E. VOLPE, Defendant.**

**Bankruptcy Nos. 82–21048, 82–2336A.**

United States Bankruptcy Court, W.D. New York.

Aug. 16, 1983.

Anthony J. DeStaffan, Newark, N.Y., for defendant.

David D. MacKnight, Rochester, N.Y., for plaintiff.

MEMORANDUM AND DECISION

EDWARD D. HAYES, Bankruptcy Judge.

The plaintiff, W.C.T.A. Federal Credit Union (Union), filed a complaint pursuant

to 11 U.S.C. § 523(a)(2) objecting to the discharge of a debt owed it by Dale Volpe for obtaining credit by failing to list all his business creditors on his financial statement. The debt resulted from a loan in the sum of $7,000 made to Colleen Volpe which Dale, her husband, had co-signed. At the time of the filing of a joint Chapter 7 petition on September 10, 1982, there was due $5,233.95 on this loan. The balance was further reduced to $2,433.95 by the sale for $2,800 of the collateral required by the Union in the debtor's 1976 BMW whose book value at the time of the loan was $5,800. At the hearing, the Court dismissed any claim against Colleen Volpe.

Before the loan was made on April 4, 1981, Dale Volpe signed a "co-maker's Guarantor's Statement" which he completed at home on March 10, 1981. A section of the statement instructed the debtor to "list all debts such as doctor bills, real estate, automobile, repairs, furniture, installments loans, etc." Volpe listed Bankers Trust Co., Clyde, for a debt of $2,240 on which $74 per month was payable and Ithaca College (student loan) for $174 on which $15 per month was payable. He listed Spartan Sports as employer and listed his position as owner-proprietor. Volpe listed his salary as N/A and approximated his net income as $600 per month. The debts which Dale Volpe did not reveal are those of Spartan Sports, the name under which he did business. These debts, however, were listed on Volpe's bankruptcy schedules and included a fully collateralized loan on store equipment from the Small Business Administration amounting to $25,000 and 18 other business debts amounting to $10,000. Volpe contends that he understood that the financial statement in question required a list of personal debts and not business debts. The question here is whether the failure to list business debts in this case is grounds for exception to Volpe's discharge under § 523(a)(2).

A discharge may be excepted for obtaining money or an extension, renewal or refinance of credit by use of a (1) statement in writing; (2) that is materially false; (3) respecting the debtor's financial condition; (4) on which the creditor reasonably relied; (5) that the debtor made with intent to deceive. 11 U.S.C. § 523(a)(2). All of these elements must be shown before a debt is excepted from discharge. There is no question that there was a materially false statement in writing. The statement instructed the debtor to list all debts. Spartan Sports was not a separate legal entity. The debtor was doing business under that name and was personally liable for all its debts. The failure to list debts amounting to $35,000 could alter the picture of the debtor's financial condition. The last two elements are more subjective and harder to establish.

In the legislative history to this section, Congress indicated that a claim of exception to discharge for false financial statements could result in abuse by a lender who with the benefit of hindsight might claim reliance. The leverage creditors have over their debtor comes not so much at the stage when the loan application is made, but rather when bankruptcy ensues. See H.R. 95–595, 95th Cong., 1st Sess. 130–131 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787, 6091.

> The premise of the exception to discharge is that a creditor that extended credit based on misinformation or fraudulent information transmitted by the debtor should be protected. The provision, however, has led to abuse in consumer cases, and has frustrated the fresh start goal of the bankruptcy discharge.

> It is a frequent practice for consumer finance companies to take a list from each loan applicant of other loans or debts that the applicant has outstanding. While the consumer finance companies use these statements in evaluating the credit risk, very often the statements are used as a basis for a false financial statement exception to discharge. The forms that the applicant fills out often have too little space for a complete list of debts. Frequently, a loan applicant is instructed by a loan officer to list only a few or only the most important of his debts. Then,

at the bottom of the form, the phrase "I have no other debts" is either printed on the form, or the applicant is instructed to write the phrase in his own handwriting. In addition, the form states that the creditor has relied on the statement in granting the loan.

However, the creditor often has other sources of information, such as credit bureau reports, to verify the accuracy of the list of debts. Nevertheless, if the debtor files bankruptcy, creditors with these financial statements are in a position to threaten the debtor with litigation to determine the dischargeability of the debt, based on the false financial statement exception to discharge. Most often, there has been no intent to deceive on the part of the debtor, and, as in so many aspects of the creditor-debtor relationship, the debtor has simply followed the creditor's instructions with little understanding of the consequences of his action.

Creditor practices in this area have been so strong that the Bankruptcy Commission recommended that the false financial statement exception to discharge be eliminated for consumer debts. This bill recognizes, however, that there are actual instances of consumer fraud, and that creditors should be protected from fraudulent debtors. It retains the exception, with small modifications. But it also recognizes that the leverage creditors have over their debtors comes not so much at the stage when the loan application is made, but rather when bankruptcy ensues. Id.

Here the Union was on notice that Dale Volpe was carrying on a business. They made no inquiries as to the assets and liabilities of the business but accepted Volpe's statement of net income.

Mr. Rhine, the General Manager of the Union, testified at the hearing on behalf of the Union. Rhine was on the committee for granting loans. He stated, "I would have normally asked him in conversation, 'How's business?'" (p. 65, TR). When asked if he demanded a financial statement of the business, his answer was, "You mean that Mr. Volpe can put down on an application he has $600 monthly net income, he says this is his monthly net income, and I still have to go after a financial statement on the business to document that?" (p. 62, TR). No proof has been offered that Volpe's statement of $600 net income was false. From a reading of the testimony, it appears that Rhine relied on the statement of the net income which was not shown to be false and not on the business balance sheet of assets and debts. At the hearing, the Court questioned the debtor as to whether the $600 per month net earnings was above the $560 monthly installments to be paid to the Small Business Administration. The Court also asked whether the SBA debt was repaid out of the debtor's personal assets or out of the business. The debtor answered that the SBA installment was paid out of the business and was paid before the net earnings of $600 were calculated (p. 83, TR).

At the hearing, counsel for the debtor argued that the debt to the Small Business Administration which was collateralized by fixtures and inventory would give only a partial picture of the financial situation without a corresponding statement of assets (p. 84, TR). He claimed that only a complete financial statement would create a picture upon which the creditor could reasonably rely. A list of bills is meaningless without a profit and loss statement to show what money is coming in and what payments are being made.

While Mr. Rhine testified that he asked the debtor whether he had any significant business obligations, this question was vague and general. Every business has debts. Their significance depends on the cash flow. The Union relied on the statement of net earnings which was truthful. The form used by the Union as a consideration for issuing credit stated that the member's debt/income ratio shall not exceed 30%. Without a business's profit or loss statement, the real debt to income ratio of Mr. Volpe and his business was impossible to ascertain.

In addition, the Union testified that it relied in making the loan upon the past credit dealings with Mrs. Volpe and also relied upon the collateral in the BMW in extending the loan.

▉ To deny Volpe his discharge, it is necessary that the debtor by omitting his business debts did so with intent to deceive. Intent may sometimes be inferred from the act of deception if not rebutted. *In re Yawnick,* 19 B.R. 1, 3 (Bkrtcy.W.D.N.Y. 1982); *In re Barrett,* 2 B.R. 296, 303 (Bkrtcy.E.D.Pa.1980); 3 Colliers on Bankruptcy ¶ 523.09, 523–64–65, n. 23–24 (15th Ed.). However, Volpe testified that he believed he was not indebted individually on the business debts and that the application inquired into individual debts and not business debts (p. 73, TR). Thus, Volpe intended no fraud by omitting a statement of his business debts. He did not list the business assets either. The debt owing to the Small Business Administration was secured by the fixtures, inventory and assets of the business. Since Volpe never set forth the fixtures, inventory and assets of the business, there was a reasonable basis for his omitting the business debts.

The burden of proof of intent is on the Union. But, after a prima facie case was established, Volpe had to come forward to rebut the inference of intent. This he did by his testimony that it was his belief that the application for co-signing a personal loan required only a statement as to non-business debts. This finding fits within the policy of Congress as to exceptions from discharge on the basis of false financial statements which require the creditor to demonstrate reliance on the statement and to show the debtor's intent to deceive. Without strong proof of these elements, the creditor would have greater leverage in this contest and the benefit of hindsight, which Congress did not intend it to have. See H.R. 95–595, 95th Cong., 1st Sess. 130–131 (1977), supra. Therefore, the debt is dischargeable and it is so ordered.