In re Bhoopendra Jairam
MOWJI, Debtor.

KARVE FAMILY LIMITED PARTNERSHIP, a Florida limited partnership, Plaintiff,

v.

Bhoopendra Jairam MOWJI, Defendant.

Bankruptcy No. 97–5183–BKC–3P7.

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

Aug. 3, 1998.

Lansing J. Roy, Jacksonville, FL, for plaintiff.

Richard A. Perry, Ocala, FL, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Bankruptcy Judge.

This Proceeding came before the Court on a complaint filed by Karve Family Limited Partnership, seeking an exception to discharge pursuant to 11 U.S.C. § 523(a)(2)(B). The trial was held on May 12, 1998. Upon the evidence presented, the Court makes the following Findings of Fact and Conclusions of law.

### FINDINGS OF FACT

In 1988, Nandkumar Karve, M.D. (Dr. Karve) and his wife, Pridi Karve (Mrs. Karve), and their two children created the Karve Family Limited Partnership (Plaintiff) as an estate planning tool for Dr. Karve and his family. Dr. Karve and his wife, are general partners of the partnership and the children are limited partners.

In 1992, Dr. and Mrs. Karve, first met Bhoopendra Jairam Mowji (Defendant) at meetings held by the India Association of North–Central Florida in Ocala, Florida. When the parties first met, Defendant was a local motel operator in the Ocala area and Dr. Karve was a local practicing physician and surgeon. Soon Defendant, Dr. Karve and Mrs. Karve began having discussions with Defendant regarding possible investments in income producing properties. Defendant eventually proposed a specific project that entailed the purchase and renovation of a motel at the junction of U.S. Highway 27 and Interstate 75 in Ocala, Florida. The motel had been closed for a number of years and would require substantial renovation before it could be opened for business.

After several meetings, Dr. Karve and his wife decided to invest in the project. The role they, their family, and the Plaintiff limited partnership would play was twofold. First, a corporation known as Ocala Lodging, Inc. was to be formed with the Plaintiff limited partnership having a shareholder interest. Second, the Plaintiff limited partnership would loan money to the newly formed corporation, with Defendant personally guaranteeing payment. Ocala Lodging was to own and operate the motel.

Dr. Karve testified that the Plaintiff limited partnership was to own 45% of the shares of stock, Defendant was to own 40%, and W.E. "Bucky" Bishop, Jr., Defendant's attorney, was to own the remaining 15%. Dr. Karve also testified that it was important to him that the Plaintiff limited partnership have a majority shareholding interest in Ocala Lodging. However, the stock certificates that were eventually issued show a significant variance. First, the Plaintiff limited partnership received no shares of stock. Instead, members of the Karve family received 45% of the stock that was issued. (Plaintiff's Ex. 7). Mr. Bishop was never issued any stock certificates and all of the remaining shares of stock (55%) were issued to Defendant. Apparently, Defendant purchased the interest held by Mr. Bishop in the corporation prior to the issuance of the stock certificates.

In July 1994, prior to making any financial investments in the project, Defendant gave Dr. Karve and his wife two documents. The first document was a *pro forma* that estimated the profitability of the project. (Plaintiff's Ex. 10). The second was a financial statement dated May 31, 1994 for Defendant and his wife, which was signed by both of them. The financial statement shows Defendant and his wife having a net worth of $1,695,500.00.

The financial statement lists Defendant's and his wife's assets and liabilities as follows:

| Assets | | Liabilities | |
|---|---|---|---|
| *Motel:* Ocala, FL Comfort Inn (Days Inn) (82% of $2,400,000) | $1,968,000 | *Motel:* Ocala, FL Comfort Inn (Days Inn) (82% of $1,200,000) | $ 984,000 |
| *Motel:* Brooksville, FL Days Inn (Leasehold) (33.3% of $500,000) | $ 166,500 | | |
| *Motel:* Manning, SC | $ 600,000 | *Motel:* Manning, SC | $ 204,000 |

| | | | |
|---|---|---|---|
| Days Inn (33.3% of $1,800,000) | | Days Inn (33.3% OF $612,000) | |
| *Motel:* Ocala, FL | $ 200,000 | *Motel:* Ocala, FL | $ 120,000 |
| Friendship Inn (33.3% of $600,000) | | Friendship Inn (33.3% of $360.000) | |
| *Automobiles:* | | *Automobile Loans:* | |
| Nissan Maxima | $ 10,000 | Caravan | $ 17,000 |
| Dodge Caravan | $ 21,000 | Lexus | $ 35,000 |
| Lexus LS400 | $ 40,000 | | |
| *Life Insurance:* New York Life Old Mutual Life | $ 15,000 | | |
| *Cash:* Barnett Bank | $ 15,000 | | |
| *Personal Jewelry:* | $ 10,000 | | |
| *Other Personal Items:* Furniture Computer Office Equipment | $ 20,000 | | |
| **TOTAL ASSETS** | **$3,055,500** | **TOTAL LIABILITIES** **NET WORTH** | **$1,360,000** **$1,695,500** |

(Plaintiff's Ex. 2).

Dr. Karve testified that he and his wife, as general partners of the Plaintiff limited partnership, relied on the financial statement in their decision to make two loans to Ocala Lodging. The first loan was in the amount of $250,000.00 and the second was in the amount of $20,000.00. The first loan was made via a cashier check for $150,000.00 dated October 20, 1994 and a personal check in the amount of $100,000.00 dated September 15, 1994. (Plaintiff's Ex. 3). The second loan was paid with a check drawn on the Plaintiff limited partnership checking account on August 9, 1995.

Dr. Karve testified that after reviewing the financial statement he was of the opinion that it was slightly inflated, but more or less true and accurate. After receipt of the financial statement, Dr. Karve inspected the project property and the Comfort Inn located in Ocala, Florida listed on Defendant's financial statement. Dr. Karve also looked at Defendant's father's property in Ocala known as the Econo Lodge. He never inspected any of the other properties listed on Defendant's financial statement.

Although both Defendant and his wife signed the financial statement, Dr. Karve believed that Mrs. Mowji did not have any interest in the properties shown on the financial statement. However, Dr. Karve was aware that Defendant's brothers had some ownership interest in the properties. In December 1994, Defendant transferred his one-third interest in the Friendship Inn to himself and his wife for no consideration. In December 1996, Defendant and his wife transferred their interest in the Friendship Inn to Defendant's uncle. The sale price of the property was $20,000.00 in the form of a promissory note to Defendant and his wife, his uncle's forgiveness of a debt owed by Defendant to his uncle in the amount of $15,000.00, and his uncle's agreement to assume Defendant's share of the mortgage (about $80,000). Defendant testified at the meeting of creditors that, at the time of the transfer, Defendant believed his share of the property had an approximate value of $120,000.00. (Plaintiff's Ex. 16, at 6–7).

Ocala Lodging was ultimately unsuccessful in its attempt to renovate and reopen the

motel. The primary reason for its failure was its inability to obtain from the State of Florida the necessary permits to operate an existing outdated water and sewage treatment plant. Eventually, a mortgage holder foreclosed on the property and the entire investment was lost. Defendant also lost all of the motel properties listed on his financial statement. The Days Inn located in Manning, South Carolina was lost through foreclosure. The Days Inn located in Brooksville, Florida was a leasehold interest that was terminated due to the failure of the tenant to pay rent. The loss of the properties occurred prior to the entry of the judgment against Defendant held by the Plaintiff limited partnership.

The Plaintiff limited partnership filed suit against Ocala Lodging and Defendant for default in payment on the two promissory notes. The suit was filed in the Circuit Court, Fifth Judicial Circuit, Marion County, Florida and a judgment was entered against the corporation and Defendant on June 10, 1997 in the amount of $333,201.57. (Plaintiff's Ex. 1). The amount of the judgment includes interest, attorney's fees and costs.

On July 10, 1997, Defendant filed a voluntary petition under Chapter 7 of the Bankruptcy Code. Plaintiff timely filed a complaint and commenced this adversary proceeding on October 15, 1997. In its complaint, Plaintiff alleges, *inter alia,* the financial statement described above was materially false; that Plaintiff reasonably relied on it; and that Defendant intended to deceive Plaintiff and its general partners through the use of the financial statement.

## CONCLUSIONS OF LAW

Section 523 outlines several grounds for excepting a debt from discharge. These provisions are designed to prevent the dishonest debtor from using the bankruptcy process to avoid the consequences of wrongful conduct. *Equine Capital Corp. v. Wolfson,* 148 B.R. 638, 640–41 (Bankr.M.D.Fla. 1992).

Plaintiff seeks to except from Defendant's discharge the debt owed by Defendant to Plaintiff pursuant to § 523(a)(2)(B) of the Bankruptcy Code. Section 523(a)(2)(B) provides in relevant part:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive....

11 U.S.C. § 523(a)(2)(B) (1998).

Plaintiff must prove each of the above elements otherwise the debt is dischargeable. *In re Miller,* 39 F.3d 301 (11th Cir.1994). Plaintiff has the burden of proving each of the elements by a preponderance of the evidence. *In re Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

### a. Statement In Writing That Is Materially False

In this proceeding, Plaintiff contends that Defendant significantly overstated the value of the motel properties listed on the May 31, 1994 financial statement. As such, Plaintiff argues that the financial statement was materially false.

This Court has held that material falsity requires more than mere inaccuracy, Plaintiff must also show a significant understatement of liabilities or an exaggeration of assets. *In re Floyd,* 177 B.R. 985 (Bankr. M.D.Fla.1995).

First, Plaintiff cites Defendant's contradictory testimony regarding the value of the Friendship Inn that had been transferred to his uncle prior to his bankruptcy filing. The financial statement provides that the Friendship Inn, which had been purchased for 450,000.00 in 1991, had a value of $600,-000.00 in May 1994. Defendant admitted at the meeting of creditors that he significantly

inflated the value in order to obtain a loan on the property. (Plaintiff's Ex. 16, at 12–13). However, at trial, Defendant testified that he believed that the financial statement accurately reflected the value of the Friendship Inn when it was provided to Dr. Karve.

Second, Plaintiff points to Defendant's contradictory testimony regarding his ownership interest in the Ocala Comfort Inn. The financial statement indicates that Defendant's ownership interest in the motel was 82% of $2,400,000.00. However, the Income Tax Return for an S Corporation that Defendant filed with the Internal Revenue Service in 1994 shows that Defendant held only an one-third interest in the property. (Plaintiff's Ex. 35). At trial, when confronted with the tax return, Defendant still contended that he owned an 82% interest in the Comfort Inn. (Tr. at 71). The impact of the difference in ownership interest amounts to $576,000.00, which represents approximately 34% of Defendant's entire net worth of $1,695,500.00 set forth on the financial statement.

Third, Plaintiff contends that Defendant's valuation of his leasehold interest in the Brooksville Days Inn was done with recklessness as to the truth. Defendant purchased his share of the ten-year leasehold for $50,-000.00, and listed the value of the property at $500,000.00 with him holding a one-third interest. Defendant testified that he and his two brothers were to receive $250,000.00 if the owners ever sold the property within the first three years of their lease term. They also had a first right of refusal with respect to the purchase of the property. (Tr. at 91).

Finally, Plaintiff disputes Defendant's valuation of the Manning Days Inn. The motel was listed on the May 1994 financial statement as having a value of $1,800,000.00 when the property had just been purchased that same month for only $700,000.00. Defendant testified that the property had some environmental problems at the time of purchase, but he believed that the problems could be rectified with the State of South Carolina's assistance. (Id. at 105–06). But, Defendant admitted that he did not participate in any discussions as the amount, if any, of state funds that would be available to meet applicable environmental standards. Defendant claimed that he arrived at the $1.8 million valuation using a formula that takes the property income multiplied by two or three. Defendant testified that the property had revenues of at least one million dollars at the time of purchase. (Id. at 94).

The greater weight of the evidence establishes that the financial statement provided by Defendant was materially false. Accordingly, Plaintiff has proven the first element under § 523(a)(2)(B).

### b. Concerning The Debtor's Financial Condition

Defendant concedes that the financial statement concerns his financial condition. (Main Case File, Doc. 12). Thus, the Court finds that Plaintiff has successfully proven the second element under § 523(a)(2)(B).

### c. Creditor Reasonably Relied On Financial Statement

Dr. Karve maintains that he relied on Defendant's financial statement when he made the decision to invest in Ocala Lodging. He also contends that such reliance was reasonable. Defendant contravenes Dr. Karve's assertion of reasonable reliance, noting that Dr. Karve never reviewed the financial statement with Defendant, nor did he request tax returns or any other documents regarding Defendant's ownership interest or the profitability of the motels. Defendant also cites Dr. Karve's admission that he believed the values of the motel properties to be inflated by $200,000.00. As such, Defendant contends that Plaintiff's reliance on the financial statement was not that of a reasonably prudent person.

The Supreme Court in *Field v. Mans*, 516 U.S. 59, 68, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) stated that "[s]ection 523(a)(2)(B) expressly requires not only reasonable reliance but also reliance itself; and not only a representation but also one that is material; and not only one that is material but also one that is meant to deceive." The reasonableness requirement of § 523(a)(2)(B) is "a more stringent standard than justifiable reliance or actual reliance." *In re Vann*, 67 F.3d 277, 280 (11th Cir.1995). The standard

for determining whether a creditor's reliance on the debtor's financial statement was reasonable is that of an ordinary and average person. *Id.*

In *In re Duncan*, 35 B.R. 323 (Bankr. W.D.Ky.1983) four classifications of unreasonable reliance were enumerated: (1) the creditor having knowledge that the financial information is not accurate; (2) the statement containing obviously inaccurate financial information; (3) the creditor's investigation of the statement suggesting its falsity or incompleteness; and (4) the creditor failing to verify the information on the statement. This Court added the caveat that in none of these categories could an absolutist approach be taken. *In re Sandlin*, 39 B.R. 936, 937 (Bankr.M.D.Fla.1984).

> If any default in any of these categories on the part of a lending institution rendered reliance on a financial statement unreasonable, then virtually no credit would be extended on the basis of reasonable reliance on what ultimately turned out to be false information. We do not believe it was Congress' policy in enacting [§ 523(a)(2)(B)] to provide for nondischargeability only in instances of the most sophisticated form of deception. Rather, we believe that the intention of the statute, read in conjunction with the cases interpreting it, to permit a finding of reasonable reliance where there is no major default in any of the areas set out in *Duncan.*

*Id.*

■ · The evidence suggests that Dr. Karve had reason to know that the financial information was not accurate or that it contained obviously inaccurate financial information. Dr. Karve testified that he believed the financial statement to be inflated by at least $200,000.00, yet, still thought it to be more or less true and accurate. As to the third category, Dr. Karve's investigation of the financial statement was limited to inspecting only one of the properties listed on the document and an unrelated property that was owned by Defendant's father. Other than his belief that the financial statement was inflated, Dr. Karve's limited investigation did not lead to the suggestion that the financial statement was false or incomplete. With respect to the fourth category, Plaintiff maintains that there is no per se duty to verify the information contained in a financial statement, thus Dr. Karve's failure to investigate all of the properties was not unreasonable.

Although it was not necessary for Dr. Karve to inspect every motel property listed on the financial statement, a reasonably prudent investor would have investigated the financial statement more thoroughly before taking such a personal financial risk. Although, Dr. Karve believed that Defendant's financial statement was more or less accurate, his willingness to invest in Ocala Lodging despite his belief that it may have been inflated, places considerable doubt on whether his reliance on the financial statement was reasonable under the ordinary and average person standard. The Court finds that under those circumstances a reasonably prudent investor would conduct a more thorough investigation of the financial statement before personally investing $250,000.00. Such an investigation would not require a personal visitation of the properties, but would certainly call for more financial documentation to substantiate the claims made on the financial statement.

This Court has also held that reliance on a financial statement four to six months old without an attempt to verify the contents is unreasonable. *In re Benore*, 108 B.R. 797, 799 (Bankr.M.D.Fla.1989). At the time Dr. Karve invested $250,000.00 on October 24, 1994 the financial statement was five months old. When he lent to Ocala Lodging an additional $20,000.00 on August 9, 1995, the financial statement reflected financial information over one year old.

Plaintiff's failure to conduct a further investigation of Defendant's representations on the financial statement despite the existence of some inaccuracies, and Plaintiff's reliance on a stale financial statement, establishes that Plaintiff's reliance was not reasonable. Accordingly, the Court finds that Plaintiff has failed to prove the ·third element of § 523(a)(2)(B).

**d. Intent to Deceive**

■ The final element, intent to deceive, can be inferred from the surrounding circum-

stances. *In re Wing*, 96 B.R. 369, 372 (Bankr.M.D.Fla.1989). "[W]here a person knowingly or recklessly makes a false representation which the person knows or should know will induce another to make a loan, intent to deceive may be logically inferred." *Id.* at 373.

 Plaintiff relies strongly on Defendant's admission during the meeting of creditors that he inflated the property values in order to obtain a bank loan. Plaintiff maintains that when Defendant provided that same inflated financial statement to Dr. Karve he intended to also deceive Dr. Karve and his family into giving him a loan. Defendant contradicted his earlier testimony when he insisted at trial that the financial statement accurately reflected the values of the motel properties.

Defendant testified that he relied on three appraisals on the Ocala Comfort Inn, one of which conducted on March 1993 valued the property at $2.3 million. (Defendant's Ex. 3). Defendant listed the property on the financial statement at $2.4 million because of recent renovations of around $100,000.00. (Tr. at 86). However, it is important to note that Defendant indicated on the financial statement that he had an 82% ownership interest in the property, when the evidence suggests that Defendant had only a 33.3% ownership interest. Defendant also proffered the May 13, 1994 closing statement for the Manning Days Inn reflecting a purchase price by Defendant of $700,000: Defendant valued the property at $1.8 million. (Defendant's Ex. 9). In an attempt to show that the financial statement was accurate, Defendant submitted the 1996 county tax appraisal valuing the property at $1,163,190.00. However, it would be incongruous for Defendant to maintain that he relied on a 1996 tax appraisal when he created the 1994 financial statement.

The weight of the evidence suggests that Defendant intended to deceive Plaintiff when he furnished the financial statement. Accordingly, Plaintiff has proven the fourth and final element of § 523(a)(2)(B).

Having failed to prove one of the four elements required for a finding of non-dischargeability under § 523(a)(2)(B), Plaintiff cannot prevail on this claim. A separate judgment consistent with these Findings of Fact and Conclusions of Law will be separately entered.